Department of Health and Human Services. Ms. Brayon. Good morning, Your Honors, and may it please the Court. The Louisiana Department of Health asked this Court to reverse a denial of its Medicaid state plan amendment that made minor adjustments to its prescription drug reimbursement over a slightly less than two-year period from November 2012 to October 2014. The Medicaid state plan determines what the state covers in its Medicaid program and which Medicaid expenditures the federal government will reimburse. The decision to disapprove Louisiana's Medicaid state plan here has triggered efforts by the federal government to recoup over $26 million in federal Medicaid funding, representing expenditures that the state made that were not in its approved state plan. That is why the state is pursuing this appeal, even though it no longer seeks to implement the methodology and has not paid under that methodology for over six years. The decision by the Centers for Medicare and Medicaid Services to disapprove the amendment in the Administrator's decision upholding that disapproval is not in accordance with the governing statute and regulations and should be reversed. At the time that the decision was made, the regulations provided that reimbursement for outpatient prescription drugs should not cost more than $1,000 plus a reasonable dispensing fee. Estimated acquisition cost was defined to mean the state Medicaid agency's best estimate of the price generally and currently paid by providers for a drug. And when it adopted that definition, CMS made very clear that it was not prescribing a preferred payment method and that states were permitted to exercise maximum flexibility in establishing how those estimates were made. And consistent with that guidance, CMS accepted and approved a wide variety of estimated acquisition costs across the country. In our appendix at pages 230 to 236 is the document that CMS used to publish periodically showing all the different methodologies that states used to estimate acquisition costs and to set their prescription drug reimbursements. And if you look at that chart, you can see that most states were reimbursing at what is known as average wholesale price minus some sort of discount or wholesale acquisition cost plus some sort of markup. And even a quick glance at that chart will show that the estimates were far from uniform and varied significantly from state to state. And the chart also shows that at that time, Louisiana had federal approval to pay average wholesale price minus 13.5% for independent pharmacies and average wholesale price minus 15% for chain pharmacies. Now, in 2012, there was a sequence of events that we believe affected the review of the state plan amendment at issue here in a way not permitted by the regulations. First, in February 2012, CMS published a proposed rule that essentially said we need to get away from average wholesale price and wholesale acquisition costs because they're not reliable indicators of what pharmacies are actually paying. Instead, CMS proposed replacing estimated acquisition costs with actual acquisition costs. And it proposed amending its regulations to require states to provide survey data reflecting pharmacies' actual or average acquisition costs any time that they submitted a proposed plan amendment. Those were not part of the rules at the time. CMS asked for comments on that proposal, which was just a proposal and not a final rule. Meanwhile, independent of what was happening at the national level, Louisiana Medicaid had also come to the conclusion that it wanted to move away from its average wholesale price methodology and to adopt what was called the average acquisition costs. Louisiana implemented that change in September 2012. But as we described in the brief, there was an almost immediate outcry, especially from small independent pharmacies, that they were being reimbursed less than their costs and threatening to withdraw from the Medicaid program if adjustments were not made. Now, at that point, the state Medicaid agency had two choices. It could have pulled back the amendment implementing average acquisition costs, gone back to its average wholesale price methodology for which it had full CMS approval, or it could put in a follow-on amendment to make a minor adjustment to the average acquisition cost approach. If it had done the former, that is, if it had abandoned average acquisition costs, there would have been no approval, no questions from CMS as to why the state was changing its methodology, no disallowance, and no reason to appeal to this court. But instead, Louisiana tried to take a step that was much more in line with the evolving federal policy by making an adjustment to the average acquisition costs methodology. But in doing so, it appears to have triggered a much more rigorous standard of review and one that we believe was not permitted under the regulations as they existed at the time. Now, we think the back and forth between CMS and the state Medicaid agency with respect to that amendment is very telling. The state was comparing its amendment to the average wholesale price methodology that it had been using for years until September 2012, just two months earlier. From the state's perspective, it was submitting an amendment that resulted in a significant drop in pharmacy reimbursement that was much closer to what plans the actual costs of pharmacies with a minor adjustment to cover the costs of additional pharmacies who were not being reimbursed their costs under the average cost methodology. CMS, however, was evaluating the amendment against the average acquisition cost standard that had been in place for only seven weeks and which CMS had not even reviewed or approved at the time that the state submitted its adjustments. Under the statute and regulations in place at the time, CMS should not have disapproved the plan amendment in the first instant. The statute provides that states must assure that their payments are consistent with efficiency and economy and are sufficient to enlist enough providers to ensure access to the Medicaid population. So, the state provided evidence to CMS that its payments were efficient and economic and that they were substantially less than what the state had been paying previously under its average wholesale price methodology. It provided evidence to CMS that it had access concerns, that is, that such services would not be available to Medicaid to the same extent as the rest of the population if adjustments were not made. Judge Graves, I can see you talking, but I can't hear you. Okay. How about now? Now I can hear you, yes. All right. The state did a survey in support of SPA 1266. That's correct. Where they looked at about four pharmacies. Is that right? Yes and no, Your Honor. The state did a survey. Before you answer that, you'll agree with me, there's over 1,000 pharmacies in Louisiana. Yes. And over 1,000 pharmacies were surveyed to determine what the average cost was. It turned out that the average cost had a bigger impact on many small independent pharmacies than the state had intended. And so, it looked to see what kind of adjustments can we make to the survey of thousands that would cover the costs of some of the smaller pharmacies. And it submitted evidence to CMS about how the impact on these four pharmacies, how they had not been having their costs reimbursed under average acquisition costs, but they would with the 1% adjustment or the 10% adjustment that the state proposed. In addition, the state had done calculations or had its consultant do calculations as to what percentage of pharmacies would have their costs reimbursed with the adjustments. So, this was surveys based on every pharmacy in the state. And these surveys were done after SPA 1255 had been approved? They were done before SPA 55 went into effect. And it's what the reimbursement in SPA 55 was based on. And then they were adjusted. Let me ask you this. Had SPA 1255 been submitted for approval before these surveys were done? You're talking about now. It had, well, I believe, yes, they had been done before the SPA 55 was submitted, because almost immediately after SPA 66 was submitted. So, the surveys had been done for SPA 55. And then they were used also to calculate how many pharmacies would have their costs reimbursed under SPA 1266. They were the same surveys. But there was only seven weeks between when one plan amendment was submitted and the second plan amendment was submitted. Does that answer your question, Your Honor? Yes. Okay. So, for the survey that the state, for the calculations that the state did as to how many pharmacies would have their costs covered with the adjustments under SPA 1266, it showed that on average, two-thirds of pharmacies would have their costs covered, and one-third of pharmacies would not have their costs covered. It appears to us that that falls very comfortably within the, for an estimate of what is generally paid by pharmacies. That is, if two-thirds of pharmacies are getting their costs covered. But under the proposed amendment, wouldn't two-thirds of the pharmacies actually be overpaid? That's not what the information showed, Your Honor. It just showed how many would be reimbursed their costs and how many would not be reimbursed their costs. And one-third of pharmacies were still not being reimbursed their costs under the average acquisition. So, you're telling me it didn't show that two-thirds of them would be overpaid, it just showed that they would be paid for what their actual costs were? Correct. It showed that they would have their costs covered, but it didn't make a distinction between was it exactly at cost, or was it a penny above cost? Or how much it would exceed cost. Correct. Correct. It didn't show that. But it did show that one-third would not have their costs reimbursed, which is a large percentage when you're talking about the ensuring access to the Medicaid population. And the statute does not say that the regulation at the time was just what is generally and commonly paid. And to set your reimbursement so that two- thirds of pharmacies would get their costs covered, and one-third would not, is certainly well within the concept of what is generally paid, especially when CMS had repeatedly told states that they had maximum flexibility in determining how their estimates should be calculated. Now, in this respect, we believe that the 1990 case that CMS has cited more than 15 times, that the federal government has cited more than 15 times in its brief, is very telling. So in that case, the state tried to set its reimbursement at the average wholesale price without a discount. The federal government said that is not a reasonable estimate because we have evidence that shows that 99% of pharmacies are paying less than 15% of average wholesale price for their drugs. And this court said, in light of that upheld the administrator's determination that at that time, the state's estimate was not reasonable, because it said the state did not submit any evidence to the contrary at the hearing before the administrator. Now, this case is exactly the opposite. Louisiana did submit evidence to the administrator as to what the costs that were incurred by pharmacies, how many were having their costs reimbursed, and how many were not having their costs reimbursed. And CMS submitted nothing, nothing to show that those were not the prices that were incurred generally and currently by pharmacies in the state. And so we believe the 1990 case helps the state in that it makes clear that the state's estimate is presumed to be valid absent evidence from CMS that it is not a reasonable estimate. And there is no indication here that the reimbursement methodology set by state was not reimbursing the prices generally and currently incurred by pharmacies in purchasing their drugs. Unless there are any questions, I'll save the remainder of my time for rebuttal. Thank you, counsel. Ms. Lopez? May it please the court, Carolyn Lopez on behalf of the government. I want to start out by just talking about the framework of this court's 1990 decision, because there in the 1990 decision, interpreting regulations that were substantively identical to the ones at issue here, the court didn't say, oh, it's CMS's burden to dispute the states. What this court clearly held is that the regulations imposed two distinct requirements. One is that, yes, states have flexibility to determine their rates depending on, you know, what's going on in the market in that state, but it still has to be the state's actual closest estimate. And second of all, the Louisiana decision, 1990 decision makes clear that it's the state's obligation to provide supporting documentation for that estimate if CMS asks, and that regardless of any sort of presumptions at the beginning, that it's always up to the administrator to disagree if that evidence doesn't support that estimate. And then just to give sort of HHS's view of what happened during this plan. So here, the administrator reasonably found that Louisiana's documentation didn't support a rate, a higher rate, significantly, a markup of up to 10 percent than the one that the state had just submitted to HHS as its best estimate, and the state chose never to withdraw. So here, what happened after years of study and public forums, Louisiana first submitted one rate to HHS, and by submitting that rate, it represented that that rate was its best estimate. And then just a few weeks later, Louisiana unilaterally switched to a higher rate, and CMS naturally asked, can you provide us the supporting documentation for why you no longer think that the methodology, the rate methodology that you just proposed to us and have never withdrawn isn't right anymore? And after a year and a half of back and forth, so HHS did exactly what it's, or CMS did exactly what it's supposed to do, which is to give the state an opportunity to explain itself, all Louisiana produced was this analysis based on four pharmacies out of more than 1,000 pharmacies. And even today, I don't hear Louisiana saying that that's statistically valid in any way, or that it could justify an across-the-board rate, not just for smaller pharmacies or pharmacies of a certain type, but an across-the-board rate forever for everybody. And then, yes, it's true that Louisiana withheld these 2012 spreadsheets, which they had, when they first submitted the first plan, the 1255 plan, and they bizarrely waited until reconsideration to submit those. And so the administrator recently found both that it was untimely at that point, because they were obligated to present it to CMS in the first instance, but also that it just didn't change. It didn't change the analysis because it didn't actually higher rate. And I'm happy to sort of talk through those 2012 spreadsheets in a minute, but I did also just want to take a moment to step back to address the state's incorrect assertion here, which actually is quite similar to the state's assertions in the 1990 case, which this court rejected in that case. But somehow the administrator wasn't applying the regulations that were in effect at that time. Again, the regulations in effect at that time required that the estimate both be the state's best and closest estimate. So this court's language is that the state was obligated to provide its closest estimate of the actual acquisition cost of pharmacists. So that's this court's language in the 1990 decision. And that the state was obligated to provide supporting documentation when asked. The only changes in 2016 are two, which are relevant here. So the first is that states, instead of being able to sort of wait to see if CMS asked for documentation, have to present certain types of documentation at the outset. But that's just simply irrelevant here because it's always been true, both in 2012 and actually still today, that if CMS has questions about whatever it is the state has submitted, it's allowed to ask for documentation for that and the state has to provide that documentation. And when the administrator makes a finding that that documentation isn't sufficient to meet the federal standards or to show that it's actually the state's closest estimate and therefore in accordance with the federal upper limits, it's entitled to disapprove the plan. And so here, it was entirely reasonable for CMS to say, listen, you've told us that this rate in best estimate. Please just explain to us why that's not right. And analysis based on four pharmacies just doesn't cut it. And neither, as the administrator explained, even assuming arguendo that you could analyze those 2012 spreadsheets, they don't cut it either. Because Louisiana, in submitting its original rate, had understood that under an average acquisition cost methodology, some individual providers are not going to be reimbursed their costs. That's what an average methodology means. Indeed, as far into this as a briefing on reconsideration to HHS, Louisiana said, look, an average methodology means approximately half of the providers aren't going to be reimbursed for their rate. So it doesn't, as the administrator explained, the 2012 spreadsheets don't interrupt that original assumption that was built into that, into the original rate. And so it's entirely reasonable to say you haven't shown us documentation that actually answer a question as to why the higher rate was justified. And then I did also want to point out that as the administrator explains that original rate also included this sort of help desk in which, if there was a problem with individual rates for individual drugs, and the 2012 spreadsheets don't actually address overall whether a pharmacy was overcompensated, undercompensated, exactly fairly compensated, what it does is it looks at a metric of like individual drugs, but it never actually says overall is, you know, pharmacy one, are their overall costs met or not met? Nor does it actually compare, which makes sense that this is the same data that they were using for 1255, nor does it actually compare the number of pharmacies that were compensated, overcompensated, undercompensated for those individual drugs between the rate under 1255 and the rate here. So we actually have no idea whether or not those numbers change at all. And that's clearly a sufficient record for the administrator to conclude that Louisiana just didn't justify its rate hike here. And then just in terms of the state has talked a little bit about these calls from pharmacists, and as the administrator made clear here, sort of receiving a number of calls in no way, you know, show meets the state's burden to show that actually this isn't their best estimated cost. And the state has just never sort of linked those up with any hard data that pharmacists were being, that the original rate actually wasn't the best estimate of costs. If I apologize with the zoom, it's a little bit hard for me to tell whether there are any additional questions from the bench. If there are no further questions, we rest on our briefs and ask that the court affirm. Thank you. Ms. Brown. Yes, I'd like to just take a step back. Louisiana's, the methodology here for which we seek approval for a short period was one of the lowest reimbursements in the country. When you look at what other states were paying based on wholesale average acquisition costs or average wholesale price, it was slightly higher. Yes, up to 10%, up to 10% on multiple source drugs, which can be a penny or a fraction of a penny. It was paying slightly higher than the average cost. Now, yes, the state had a payment based on SPA 1255. Yes. And no, no, it was what payment based on 1255. The one you're complaining about that you're saying was low. I'm not saying it was woefully low. I'm saying both 55 and 66 at SPA 1266 was much lower than the state had been paying. It was much lower than what most other states were paying. It was a very slight adjustment. Yet the government says up to 10%, but up to 10% for multiple source drugs, which is usually a penny or a fraction of a penny and a 1% adjustment on brand name drugs. It was a slight adjustment that covered the cost of slightly more pharmacies. It still did not cover the cost of one third of pharmacies for any particular drug. On average, one third of pharmacies were not being reimbursed their costs. It was a, the notion that this was not efficient and economic, which is what the statute requires. The federal government completely disregards the concerns that the state had regarding access. And it focuses on the language of your best estimate or your closest estimate. Yes, that may be part of the standard, but it's also an estimate of prices generally paid. Well, generally paid doesn't mean exactly the midpoint or 50%. Generally paid is not defined by a percentage. It's not defined by a survey. It's not defined by anything that the federal government ever put out to say, what does it mean to be generally paid? Now there is case law on other types of Medicaid services, also subject to the efficient and economic standard, where states were told that if you're not reimbursing the cost of 75% of providers, that your rates are too high. Here, Louisiana had a much, was reimbursing the cost on average of a much lower percentage than that. It falls very comfortably within the concept of what is generally paid. So can the states estimate when it submitted 1255, that the average is what was generally paid? That was presumptively valid. When it got a lot of pushback saying those rates are much too low, and it raised it by 1% or a fraction of a penny to say, okay, now we're reimbursing the costs that are generally paid. That was completely appropriate and within the state's purview to do. Certainly within the maximum flexibility that was contemplated under the regulations. Judge Ho, I see you took your microphone off. Do you have a question or are you just ready to get out of here? I would also like very quickly to touch on the argument that the state submitted the survey information showing the percentage of pharmacies that would not be reimbursed the timely. It was appropriate for the state to submit that information on reconsideration. It certainly was not purposefully withheld. The rules on reconsideration say that the party has the right to submit any evidence relevant to the issues. The issues that were identified for the hearing on consideration was whether the state's proposed reimbursement met the statutory and the state had submitted sufficient evidence to support its estimate. When the state was told on the disapproval that what it had submitted was insufficient, it submitted additional information which was entirely appropriate under the rules for reconsideration and it should have been considered by the administrator instead of dismissed. We ask the court to reverse the agency's disapproval of the amendment. Thank you, your honors. Thank you, counsel. That will conclude the arguments today and actually for this panel for the week. Thank you. Thank you.